[Cite as *State ex rel. Caretenders of Cleveland v. Indus. Comm.*, 2016-Ohio-1030.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Caretenders of Cleveland, Inc. Caretenders n.k.a. Almost Family, Inc., | : | |
| Relator, | : | |
| v. | : | No. 15AP-116 |
| Industrial Commission of Ohio and Rosa O. Sandoval, | : | (REGULAR CALENDAR) |
| Respondents. | : | |
| | : | |

---

# D E C I S I O N

### Rendered on March 15, 2016

---

**On brief:** *Ross, Brittain & Schonberg Co., LPA, Michael J. Reidy*, and *Meredith L. Ullman,* for relator.

**On brief:** *Michael DeWine*, Attorney General, and *Natalie J. Tackett,* for respondent Industrial Commission of Ohio.

**On brief:** *Seaman & Associates,* and *Michael I. Madden,* for respondent Rosa O. Sandoval.

---

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

DORRIAN, P.J.

{¶ 1} Relator, Caretenders of Cleveland, Inc. Caretenders n.k.a. Almost Family, Inc., has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order awarding permanent total disability ("PTD") compensation to respondent Rosa O. Sandoval ("claimant"), and to enter an order denying said compensation.

{¶ 2}    Pursuant to Civ.R. 53(D) and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto. The magistrate recommends that this court deny the request for a writ of mandamus.

{¶ 3}    Relator has filed the following two objections to the magistrate's decision:

> [I.] The evidence relied upon by the staff hearing officer "to the exclusion of all other evidence" was almost three years old at the time of the hearing and was stale.

> [II.] The "some evidence" standard was not met because Respondent Rosa Sandoval's current medical records of treatment indicate she suffers from conditions not recognized in her claim.

{¶ 4}    The arguments raised in relator's objections are essentially the same as those raised to and addressed by the magistrate.

{¶ 5}    As pointed out by the magistrate, it is not clear to this court as to why the hearing on claimant's application for PTD compensation was delayed for some two and one-half years after the application was filed.  Nevertheless, Ohio Adm.Code 4121-3-34(C) states:

> The following procedures shall apply to applications for permanent total disability that are filed on or after the effective date of this rule.

> (1) Each application for permanent total disability shall identify, if already on file, or be accompanied by medical evidence from a physician, or a psychologist or a psychiatric specialist in a claim that has been allowed for a psychiatric or psychological condition, that supports an application for permanent total disability compensation. The medical examination upon which the report is based must be performed within twenty-four months prior to the date of filing of the *application* for permanent total disability compensation. * * * Where it is determined at the time the application for permanent total disability compensation is filed that the claim file contains the required medical evidence, the application for permanent total disability compensation shall be adjudicated on its merits as provided in this rule absent withdrawal of the application for permanent total disability compensation.

(Emphasis added.)

{¶ 6}   Dr. Anthony J. Wyrwas' report was filed August 25, 2011 and was based on a medical examination which was performed on July 18, 2011.   This examination was conducted "within twenty-four months prior to the date of filing of the application" for PTD compensation, which was filed on October 20, 2011.

{¶ 7}   Furthermore, as noted by the magistrate, Supreme Court of Ohio case law holds that non-allowed conditions do not necessarily defeat a claim for compensation of an allowed condition.   *State ex rel. Waddle v. Indus. Comm.,* 67 Ohio St.3d 452, 455 (1993); *State ex rel. Bradley v. Indus. Comm.*, 77 Ohio St.3d 239, 242 (1997); and *State ex rel. WCI Steel, Inc. v. Indus. Comm.*, 96 Ohio St.3d 24, 2002-Ohio-3315, ¶ 13, citing *Waddle.*

{¶ 8}   Upon review of the magistrate's decision, an independent review of the record, and due consideration of relator's objections, we find the magistrate has properly determined the pertinent facts and applied the appropriate law. We therefore overrule relator's two objections to the magistrate's decision and adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. Accordingly, the requested writ of mandamus is hereby denied.

*Objections overruled;*
*writ of mandamus denied.*

KLATT and BRUNNER, JJ., concur.

# APPENDIX

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. | : | |
| Caretenders of Cleveland, Inc. | | |
| Caretenders nka Almost Family, Inc., | : | |
| | | |
| Relator, | : | |
| | | |
| v. | : | No. 15AP-116 |
| | | |
| Industrial Commission of Ohio and | : | (REGULAR CALENDAR) |
| Rosa O. Sandoval, | | |
| | : | |
| Respondents. | | |
| | : | |
| | : | |

### MAGISTRATE'S DECISION

**Rendered on December 10, 2015**

*Ross, Brittain & Schonberg Co., LPA, Michael J. Reidy* and *Meredith L. Ullman,* for relator.

*Michael DeWine*, Attorney General, and *Natalie J. Tackett,* for respondent Industrial Commission of Ohio.

*Seaman & Associates,* and *Michael I. Madden,* for respondent Rosa O. Sandoval.

### IN MANDAMUS

{¶ 9}  In this original action, relator, Caretenders of Cleveland, Inc., Caretenders nka Almost Family, Inc. ("relator" or "Caretenders"), requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order awarding permanent total disability ("PTD") compensation to respondent, Rosa O. Sandoval ("claimant"), and to enter an order denying the compensation.

Findings of Fact:

{¶ 10} 1. On January 7, 2006, claimant sustained an industrial injury while employed as a home health aide for relator, a state-fund employer.  The claim was initially allowed for "sprain of neck" and assigned number 06-301735.

{¶ 11} 2. On September 22, 2006, claimant moved that her claim be additionally allowed for "[a]ggravation of pre-existing degenerative disc disease at C2 through C-7."

{¶ 12} 3. By letter dated December 1, 2006, claimant's counsel withdrew the September 22, 2006 motion for additional claim allowances.

{¶ 13} 4. On December 12, 2006, a district hearing officer ("DHO") mailed an "ex parte order" that dismissed claimant's September 22, 2006 motion.

{¶ 14} 5. On March 7, 2007, claimant moved for additional claim allowances.

{¶ 15} 6. Following a May 29, 2007 hearing, a DHO issued an order additionally allowing the claim for "aggravation of pre-existing degenerative disc disease at C5-6, C6-7."  Also, temporary total disability ("TTD") compensation was awarded.

{¶ 16} 7. Relator administratively appealed the DHO's order of May 29, 2007.

{¶ 17} 8. Following a September 14, 2007  hearing, a staff hearing officer ("SHO") issued an order stating that the DHO's order "is modified."  However, the claim remained additionally allowed for "aggravation of pre-existing degenerative disc disease at C5-6, C6-7."  TTD compensation was also awarded.

{¶ 18} 9. Apparently,  the  SHO's  order  of  September  14,  2007  was  not administratively appealed.

{¶ 19} 10. On December 23, 2008, the Ohio Bureau of Workers' Compensation ("bureau") moved to terminate TTD compensation on grounds that the industrial injury had reached maximum medical improvement ("MMI").

{¶ 20} 11. Following  a  February  2,  2009  hearing,  a  DHO  issued  an  order terminating TTD compensation, effective the hearing date, on grounds that the industrial injury had reached MMI.

{¶ 21} 12. Claimant administratively appealed the DHO's order of February 2, 2009.

{¶ 22} 13. Following a March 4, 2009 hearing, an SHO issued an order affirming the DHO's order of February 2, 2009.

{¶ 23} 14. In April 2010, claimant was referred to bureau-sponsored vocational rehabilitation services.

{¶ 24} 15. In June 2010, claimant underwent a functional capacity evaluation ("FCE") which was performed by a physical therapist. In his four-page report, the physical therapist found that claimant's "performance in lifting tasks and walking speed would place her in the physical demands classification of: **LESS THAN SEDENTARY**." (Emphasis sic.)

{¶ 25} 16. On July 23, 2010, a vocational case manager signed a "Vocational Rehabilitation Closure Report" on a form provided by the bureau. The closure report states:

> [Injured Worker] was referred for voc[ational] rehab[litation] due to her job-related injury while employed as a home health aide. [Injured Worker] slipped on ice as she was on her way to purchase her patient's meds. [Injured Worker] is a Spanish speaking immigrant with a working permit. She does not speak English. In addition to her language difficulties [Injured Worker] does not have a driver's license and relies on others for transportation. She expressed her wish to return to the same employer if she could be accommodated or find work as a domestic worker. [Injured Worker] was referred for a pre-plan FCE according to which her physical capacities were assessed at sub-sedentary level. The evaluating therapist recommended work hardening and [physician of record] submitted a script for the same hoping to help [Injured Worker] improve beyond her current level of function since she would need to function at least at light level in order to seek employment where English language would not be required; however, BWC did not agree to approve work hardening.

{¶ 26} 17. On August 25, 2011, claimant's treating chiropractor Anthony L. Wyrwas, D.C., wrote to claimant's counsel. Dr. Wyrwas wrote:

> This letter is written regarding Ms. Rosa Sandoval, who was injured on January 7, 2006 while working as a home health aide. Ms. Sandoval was walking to the client['s] house when she slipped and fell backwards on snow and ice on the ground. Ms. Sandoval injured her neck and upper back as a result of this slip and fall injury, and has allowed conditions of sprain of cervical spine and aggravation of substantial degenerative disc disease C5/C6 and C6/C7.

Ms. Sandoval[] has undergone extensive conservative treatment including multiple years of physical therapy and rehabilitation, chiropractic care, a home exercise program, neck and back strengthening exercises and a pain management program. Additionally, Ms. Sandoval has undergone cervical injections with pain management and has undergone cervical manipulation under anesthesia; all without providing any long-term benefits. Currently, she is still receiving oral medications to help with significant levels of neck pain and bilateral tingling arm pain, numbness and weakness.

Ms. Sandoval had [a] checkup with [sic] on July 18, 2011. She was reporting 8/10 visual analog scale neck pain with bilateral tingling arm pain and numbness. Prior to this checkup she was referred into vocational rehabilitation but was not able to find any work and could not perform many tasks given to her because of language difficulty, transportation difficulty, neck pain and arm pain with weakness.

Considering the extent of conservative care provided, and taking into consideration her language and transportation difficulties as well as her current levels of neck pain/arm pain; it is not probable that Ms. Sandoval is capable of finding sustained remunerative employment at this time or in her future. This patient is not a surgical candidate and long-term conservative care has not provided much resolution of her symptoms. It is highly unlikely she will return to work in any capacity.

{¶ 27} 18. On October 20, 2011, claimant filed an application for PTD compensation. In support, claimant submitted the August 25, 2011 report of Dr. Wyrwas.

{¶ 28} 19. On December 15, 2011, at the commission's request, claimant was examined by Robert Mark Fumich, M.D. In his two-page narrative report, Dr. Fumich opines:

It is my opinion this individual has reached maximum medical improvement for all the injuries recognized in this claim. There has been no active treatment for the past year and one-half.

We used the AMA Guides to Evaluation of Permanent Impairment, 5th edition, to determine a whole person impairment. We used Table 15-5. It is felt she falls under

DRE Cervical Category II and has a 7% whole person impairment.

We feel she is capable of light work with regards to the conditions allowed in this claim. However, she does claim other injuries and other parts not recognized in this claim, which may limit her to less than light work. However, it is my opinion the cervical conditions recognized in the claim limit her to light work duty.

In addition, with regards to the 7% whole person impairment, she has 0% for the sprain of the neck and the 7% is for the aggravation of preexisting degenerative disc disease at C5-6 and C6-7.

Please note I hold the above opinions within a reasonable degree of medical certainty.

(Emphasis sic.)

{¶ 29} 20. On December 15, 2011, Dr. Fumich completed a "Physical Strength Rating" on a form provided by the commission. On the form, Dr. Fumich indicated by his mark that claimant is capable of light work.

{¶ 30} 21. At claimant's request, vocational expert Mark A. Anderson performed a vocational assessment. In his five-page narrative report, dated February 22, 2012, under "IV Work History Experience," Anderson writes:

Ms. Rosa Sandoval last worked in March of 2006. An attempt to return to work in 2007 was unsuccessful. A review of the work history noted Home Health Aid[e] from 2005-2006, Sewing Machine Operator 2002-2004 and Housekeeper from 2005-2006. All jobs in the U.S. Economy are listed in the Dictionary of Occupational Titles, (DOT). Accordingly, Ms. Rosa Sandoval's work history would be classified as follows:

| JOB TITLES | DOT CODE | SKILL LEVEL | STRENGTH LEVEL |
| --- | --- | --- | --- |
| Home Attendant | 354.377-014 | SEMI-SKILLED | MEDIUM |
| Sewing Machine Operator | 787.682-046 | UNSKILLED | LIGHT |
| Housekeeper-church | 389.667-010 | UNSKILLED | MEDIUM |

There would be no transferable skills developed from any of her past work activities.

* * *

**VII. SUMMARY AND CONCLUSIONS**

Anthony J. Wyrwas, D.C., has opined that it is not probable that Ms. Sandoval is capable of finding sustained remunerative employment at this time or in her future and that it is highly unlikely Ms. Sandoval will return to work in any capacity.

Additionally there are some other non-exertional restrictions including:

A)    No clerical aptitude;
B)    Constant neck pain that radiates into arms and hands despite therapeutic interventions;
C)    No transferable skills from limited work history;
D)    Prolonged period away from workforce;
E)    Illiteracy (Cannot read or write in English);
F)    Inability to tolerate extremes in temperature or humidity;
G)    Needs to rest during the day due to pain;
H)    3 Vocational Rehabilitation Case Closures- found not feasible for vocational rehabilitation services geared at attempting to return to work;
I)    Attempted to administer Purdue Pegboard, testing stopped due to increase in neck pain;
J)    Does not posses[s] a G.E.D. (attended formal schooling through 3rd Grade in El Salvador).

**SUMMARY AND CONCLUSIONS**

Based on the exertional and non-exertional limitations listed above, it is my opinion that Ms. Rosa Sandoval has no return to work potential. The medical reports and testing indicate that Ms. Sandoval is capable of performing less than the full range of sedentary activities.

The Vocational Diagnosis and Assessment of Residual Employability (VDARE) confirms that Ms. Sandoval is not employable in the local, state or national economies. Based on her physical impairments and in conjunction with my evaluation and testing, Ms. Sandoval is not a candidate for vocational rehabilitation as evidenced by the documented vocational rehabilitation case closure documents and my February 20, 2012 evaluation findings.

{¶ 31} 22. It can be noted at this point that the PTD application filed October 20, 2011 was not heard by an SHO until May 8, 2014, some two and one half years after the

application was filed. The record contains no explanation as to why the hearing on the application was delayed for such a lengthy period of time.

{¶ 32} 23. Apparently, on April 2, 2012, claimant underwent an MRI of her cervical spine. However, the actual radiologist report of findings is not contained in the stipulated record of evidence. We know there was an MRI on April 2, 2012 because the report of Dr. Jewell (see below) indicates that an MRI report dated April 2, 2012 was reviewed by Dr. Jewell.

{¶ 33} 24. The record contains a four-page narrative report dated December 26, 2013 from Gregory M. Jewell, M.D. Dr. Jewell's report was generated in response to the managed care organization's ("MCO") denial of a November 14, 2013 request for epidural steroid injections at bilateral C6 and C7.

{¶ 34} 25. In his report, Dr. Jewell wrote:

> **RELEVANT MEDICAL RECORDS REVIEWED:**
>
> April 2, 2012- Report of MRI cervical spine. Impression: "Degenerative uncovertebral joint spurring on the left appears to cause narrowing of the left C3, C4, and C5 foramina as above. No cord compression or overall canal stenosis is seen." No mention of any pathology at C6 or C7. The report states "the remaining levels are unremarkable."
>
> * * *
>
> **DISCUSSION/CLINICAL RATIONALE/TREATMENT RECOMMENDATIONS:**
>
> The records describe the injured worker with the allowed conditions noted above. It is relevant to note that there is a dismissed ICD-9 code of degenerative disc disease at C2-C-3. The record review describes chronic cervical pain subsequent to work injury in January 2006. She has had conservative treatment to date with epidural steroid injection on May 7, 2013 and June 28, 2013. However, most recent MRI of April 2, 2012 described degenerative changes on the left at C3, C4, and C5 and stated "the remaining levels were unremarkable." That is, there is no description of any nerve root compression, stenosis, or foraminal narrowing at C6 or C7 in this report.
>
> * * *

It is my opinion that there is lack of support for repeat cervical epidural steroid injections. The records clearly indicate she has had two injections in the last six months but the records fail to identify specific radicular symptoms or physical findings to support a specific level and most recent MRI states at C6 and C7 there were no remarkable findings. The records make no mention of any lesion or compression of a nerve root resulting in foraminal stenosis or narrowing to explain any radicular symptoms to support cervical epidural steroid injection. Providing injection at both levels without evidence of compression or supporting objective findings is not appropriate. Additionally, treatment guidelines do not support chronic use of epidural steroid injections as indicated above. Therefore, given the lack of imaging study to support nerve root compression to explain radiculopathy or radicular symptoms, lack of documented objective findings of radiculopathy on physical exam to support a specific level, and no electrodiagnostic studies confirming presence of ongoing radiculopathy at a specific level, it is my opinion there is insufficient evidence to support the requested epidural steroid injections as reasonably related or necessary and appropriate.

{¶ 35} 26. The record contains a nine-page document prepared by certified nurse practitioner ("CNP") Todd M. Markowski, who was apparently employed by the Metro Health System.

{¶ 36} On April 16, 2014, CNP Markowski wrote:

**PAIN MANAGEMENT FOLLOW-UP**

**SUBJECTIVE:**
History was provided by the patient and Angel (husband). Since the last visit for cervical pain, patient has had gradually worsening course. Pain is currently described as intense and continuous with radiation to arms and shoulders, and is made worse by movement. Patient is being seen for degenerative narrowing of the left C3, C4, and C5 foramina. She has not been seen here in 5 months. She has had ESIs in the past, I placed a C9 at her last visit for additional ESIs in the cervical spine, it was denied.

* * *

EXAMINATION

MR C-SPINE W/O

CLINICAL HISTORY
722.4

COMPARISON
None

TECHNIQUE
Patient questionnaire was completed and was reviewed by MRI personnel prior to the patient entering the scanner.

Multiplanar, multisequence MR imaging of the cervical spine was performed without intravenous contrast.

Comments: None

FINDINGS
No signal abnormalities of the cord are seen. The craniocervical junction is normal.

At C2-3, there is left uncovertebral joint spurring that appears to cause mild to moderate left C3 foraminal narrowing. No cord compression is seen.

At C3-4, left uncovertebral joint spurring appears to cause mild to moderate left C4 foraminal narrowing. No cord compression is seen.

At C4-5, left uncovertebral joint spurring appears to cause mild to moderate left C5 foraminal narrowing. No cord compression is seen. The remaining levels are unremarkable.

IMPRESSION
Degenerative uncovertebral joint spurring on the left appears to cause narrowing of the left C3, C4, and C5 foraminal, as above. No cord compression or overall canal stenosis is seen.

{¶ 37} 27. It can be observed that CNP Markowski's April 16, 2014 report of MRI findings fails to identify the source of Markowski's statement of the MRI findings. Markowski does not actually indicate that his reporting of MRI findings is taken from an April 2, 2012 MRI report.  However, relator's counsel insists that CNP Markowski is simply repeating verbatim the actual April 2, 2012 MRI report that is not contained in the stipulation of evidence.

{¶ 38} 28. The record contains a seven-page document prepared by Brendan Astley, M.D., who also is employed by Metro Health System.

{¶ 39} On April 22, 2014, Dr. Astley wrote:

> DATE OF PROCEDURE: 04/22/2014
>
> PRE-OPERATIVE DIAGNOSIS: Cervical radiculitis [723.4]
>
> POST-OPERATIVE DIAGNOSIS: Same
>
> PROCEDURE: Bilateral C6 and C7 Cervical Epidural.
>
> * * *
>
> INDICATIONS: This patient is a 53 year old female with a significant history of neck, shoulder and arm pain. Physical exam and Radiological findings correlate with the pre-operative diagnoses. Because of these findings we elected to proceed with cervical epidural steroid injection at the bilateral C6 and C7 level(s).

{¶ 40} 29. Following a May 8, 2014 hearing, an SHO mailed an order on June 3, 2014 awarding PTD compensation. The SHO's order states:

> The Hearing Officer finds that the Injured Worker has met her burden of proof that the injury she sustained on 01/07/2006 resulting in the above allowed conditions, has left the Injured Worker incapable of returning to work in any capacity. The Hearing Officer relies upon the report of Anthony Wyrwas, D.C. dated 08/25/2011 rendering this decision. Chiropractor Wyrwas found that given to [sic] the Injured Worker's lack of success in participating in Vocational Rehabilitation due to her language difficulty, transportation difficulty, neck pain and arm pain, it is highly unlikely that she will return to work in any capacity.
>
> The Injured Worker was found to have reached maximum medical improvement for the allowed conditions of this claim as of 02/02/2009. Since that time, the Injured Worker has undergone extensive treatment which has included injections. The Injured Worker is not a surgical candidate.
>
> The Injured Worker attempted a rehabilitation program in 2009 and 2010, however, the Injured Worker was found not feasible due to her medical condition. Further, the Hearing Officer notes that the Injured Worker does not speak much

English, has a limited education and does not have a drivers' license. The Injured Worker received minimal education, approximately second grade, in El Salvador prior to coming to the United States in 1991. The Injured Worker has limited ability to read and write, and cannot do basic math very well. A pre-plan Functional Capacity Evaluation indicated that the Injured Worker was at a sub-sedentary level.

The Hearing Officer finds that the Injured Worker has few transferable skills, that coupled with the allowed conditions of this claim would lend [sic] to sustained remunerative employment. The Injured Worker has worked as a housekeeper (medium level), a sewing machine operator and a home health aide (medium level). The Hearing Officer notes the Vocational Assessment by Mark Anderson dated 02/22/2012 concludes that the Injured Worker has no return to work potential as the Injured Worker is capable of performing less than the full range of sedentary activities.

The Hearing Officer reviewed the report from Dr. Robert Fumich dated 12/15/2011 indicating that the Injured Worker is capable of light work, however, the Hearing Officer does not find this report persuasive given the extent of the Injured Worker's ongoing condition and extent of continued treatment. Coupled with the non-disability factors, the Hearing Officer did not rely upon the 12/15/2011 report of Dr. Fumich. Given the Injured Worker's lack of transferable skills, the Hearing Officer finds the Injured Worker incapable of sustained remunerative employment.

The Hearing Officer notes that the Injured Worker is approximately 53 years of age. The Hearing Officer finds that the Injured Worker's age is not in and of itself a negative factor which would prevent the Injured Worker from sustaining and performing sustained remunerative employment. The Hearing Officer finds that the Injured Worker's age is thus found to be a neutral factor in the present case.

After a review of all the reports and evidence on file, and considering the totality of all the medical evidence, the Hearing Officer finds that reports of Anthony Wyrwas, D.C. and Mark Anderson some evidence to support the Injured Worker's position that the injuries sustained on 01/07/2006 in this claim and non-disability factors, have rendered her unable to perform sustained and remunerative employment.

{¶ 41} 30.  On June 10, 2014, relator moved for reconsideration of the SHO's order of May 8, 2014, mailed June 3, 2014.

{¶ 42} 31.  On June 27, 2014, the three-member commission mailed an interlocutory order indicating that the SHO's order of May 8, 2014 may contain a clear mistake of law.

{¶ 43} 32.  On October 14, 2014, the three-member commission heard relator's request for reconsideration.  On November 7, 2014, the commission mailed an order denying relator's motion for reconsideration and holding that the SHO's order mailed June 3, 2014 "remains in full force and effect."

{¶ 44} 33.  Earlier, on September 17, 2014, claimant moved for an adjustment of the PTD start date.

{¶ 45} 34.  Following a January 9, 2015 hearing, an SHO issued an order setting August 25, 2011 as the PTD start date based upon the report of Dr. Wyrwas.

{¶ 46} 35.  On February 18, 2015, relator filed this mandamus action.

Conclusions of Law:

{¶ 47} The SHO's order of May 8, 2014 awards PTD compensation based upon the August 25, 2011 report of treating chiropractor Anthony Wyrwas, D.C., and the February 22, 2012 report of vocational expert Mark A. Anderson.  The SHO specifically rejected the December 15, 2011 report of Robert Mark Fumich, M.D., who examined at the commission's request.  Here, relator does not directly challenge the report of Dr. Wyrwas or the report of Mark Anderson.  That is, relator does not directly challenge the medical and vocational evidence upon which the SHO relied in awarding PTD compensation.  Accordingly, the report of Dr. Wyrwas and the report of Mark Anderson are not under review in this action.

{¶ 48} Unfortunately, without explanation, the commission delayed for some two and one-half years to hear the PTD application.  During that time period following the filing of the PTD application, claimant continued to seek medical treatment.  Relator contends that the medical treatment records that followed the filing of the PTD application show that claimant was not disabled by the allowed conditions of the claim, but that she may be disabled by non-allowed conditions.  That is, relator contends that the April 2, 2012 MRI conducted over five months after the October 20, 2011 filing of the PTD application shows that the allowed condition "aggravation of pre-existing degenerative

disc disease at C5-6, C6-7" could not be causing disability because the MRI report allegedly stated that those levels of the spine are "unremarkable." Relator further contends that any disability, if it exists, must be caused by the levels of the spine that are not allowed in this industrial claim.

{¶ 49} According to relator, the SHO's order of May 8, 2014 that awards PTD compensation is an abuse of discretion because the SHO failed to address in his order the medical treatment evidence that was generated long after the filing of the PTD application. That is, relator contends that the SHO's order fails to determine claimant's "current" medical status as of the date of the May 8, 2014 hearing. (Relator's Brief, 9.)

{¶ 50} The magistrate disagrees with relator's argument that the commission abused its discretion.

## Basic Law

{¶ 51} Ohio Adm.Code 4121-3-34 sets forth the commission's rules applicable to the adjudication of PTD applications.

{¶ 52} Ohio Adm.Code 4121-3-34(C) is captioned "Processing of applications for permanent total disability."

{¶ 53} Ohio Adm.Code 4121-3-34(C)(1) currently provides:

> Each application for permanent total disability shall identify, if already on file, or be accompanied by medical evidence from a physician, or a psychologist or a psychiatric specialist in a claim that has been allowed for a psychiatric or psychological condition, that supports an application for permanent total disability compensation. The medical examination upon which the report is based must be performed within twenty-four months prior to the date of filing of the application for permanent total disability compensation.

{¶ 54} Ohio Adm.Code 4121-3-34(C)(1)'s 24-month limitation on medical evidence submitted in support of a PTD application is consistent with the following provision of R.C. 4123.52:

> The commission shall not make any modification, change, finding, or award which shall award compensation for a back period in excess of two years prior to the date of filing application therefor.

{¶ 55} In the seminal case of *State ex rel. Waddle v. Indus. Comm.*, 67 Ohio St.3d 452 (1993), the court held that non-allowed medical conditions cannot be used to advance or defeat a claim for compensation. Later, in *State ex rel. Bradley v. Indus. Comm.*, 77 Ohio St.3d 239 (1997), citing its decision in *Waddle,* the court stated that the mere presence of a non-allowed condition in a claim does not itself destroy the compensability of the claim, but the claimant must meet his or her burden of showing that an allowed condition independently caused the disability. Even if the non-allowed conditions are severe, they are irrelevant as long as the allowed conditions are independently disabling. *State ex rel. WCI Steel, Inc. v. Indus. Comm.,* 96 Ohio St.3d 24, 2002-Ohio-3315, citing *Waddle.*

{¶ 56} "In any order of the Industrial Commission granting or denying benefits to a claimant, the commission must specifically state what evidence has been relied upon, and briefly explain the reasoning for its decision*." State ex rel. Noll v. Indus. Comm.,* 57 Ohio St.3d 203, at syllabus. The commission need not cite evidence it has considered and rejected; nor must it explain why it finds certain evidence to be unpersuasive. *State ex rel. Scouler v. Indus. Comm.,* 119 Ohio St.3d 276, 2008-Ohio-3915, ¶ 15, citing *State ex rel. DeMint v. Indus. Comm.,* 49 Ohio St.3d 19, 20 (1990); *see also State ex rel. Lovell v. Indus. Comm.,* 74 Ohio St.3d 250, 252 (1996).

{¶ 57} We must presume the regularity of the commission's proceedings. *Lovell* at 252, citing *State ex rel. Brady v. Indus. Comm.*, 28 Ohio St.3d 241 (1990). Within this presumption lies "a second presumption—that the commission indeed considered all of the evidence before it." *Lovell* at 252. This presumption, however, is refutable. *See State ex rel. Fultz v. Indus. Comm.,* 69 Ohio St.3d 327 (1994); *see also Scouler.*

{¶ 58} Here, the presumption is that the SHO considered the evidence of medical treatment received after the filing of the PTD application, including the April 2, 2012 MRI, but did not find persuasive relator's argument based on that evidence. This is so, notwithstanding that the SHO's order of May 8, 2014 does not mention the post-filing medical treatment records, the April 2, 2012 MRI or relator's argument at the hearing. That is, the SHO was free to determine, without explanation in the order, that the post-filing evidence of medical treatment did not destroy or diminish the persuasiveness of Dr. Wyrwas' report.

{¶ 59} Moreover, relator's argument is not compelling. The April 22, 2014 report of Dr. Astley shows that, on April 22, 2014, relator underwent a "Bilateral C6 and C7 Cervical Epidural," which relator does not contend is treatment for a non-allowed condition. Thus, claimant's allowed spinal condition was being treated within three weeks of the May 8, 2014 hearing. This undisputed fact undermines relator's argument that all of the so-called "current" medical evidence is inconsistent with industrial disability.

{¶ 60} That there is evidence in CNP Markowski's April 16, 2014 report that claimant may be suffering from problems at the C3, C4, and C5 levels of the spine which are not allowed does not destroy the compensability of the claim. *Waddle, Bradley, WCI Steel.*

{¶ 61} Moreover, relator cites to no authority supporting its suggestion that the commission must give greater weight to medical evidence generated closer in time to the hearing date.

{¶ 62} As earlier noted, Ohio Adm.Code 4121-3-34(C)(1) requires that the PTD applicant submit evidence supporting the application based upon a physician's examination performed within a 24-month period prior to the date of the filing of the PTD application. Here, the August 25, 2011 report of Dr. Wyrwas upon which the commission exclusively relied for medical evidence was undisputedly based upon an examination well within the 24-month back period. Clearly, it was within the commission's discretion to rely upon the medical report notwithstanding later evidence of treatment.

{¶ 63} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).